UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
BEN SONG,                              :
                                       :
                    Plaintiff,         :
                                       : 05 Civ. 8132 (LAK)(THK)
            -against-                  :
                                       :
                                       :
JOHN E. POTTER, POSTMASTER GENERAL,    :
                                       :
                    Defendant.         :
---------------------------------------X
BEN SONG,                              :
                                       :
                    Plaintiff,         :
                                       : 06 Civ. 904 (LAK)(THK)
            -against-                  :
                                       :
                                       : **Report and**
                                       : **Recommendation**
JOHN E. POTTER, POSTMASTER GENERAL,    :
                                       : **(PRO SE)**
                    Defendant.         :
---------------------------------------X

**FROM: THEODORE H. KATZ, United States Magistrate Judge**
**TO: HON. LEWIS A. KAPLAN, United States District Judge**

Plaintiff, Ben Song ("Plaintiff"), proceeding pro se, brings these consolidated actions pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. ("Title VII"), and the Age Discrimination in Employment Act ("ADEA"). Plaintiff is a sixty-seven-year-old Chinese-American employed with the United States Postal Service ("USPS"). He alleges that during the course of his employment with the USPS, disciplinary actions were taken against him because of his race, color, national origin, and age, as well as in retaliation for prior complaints of discrimination.

1

This case was referred to this Court for general pretrial supervision and Reports and Recommendations on dispositive motions, pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C). Pretrial discovery has been completed and presently before the Court is Defendant's Motion for Summary Judgment, pursuant to Federal Rule of Civil Procedure 56 [Docket Entry #8]. For the reasons set forth below, the Court recommends that Defendant's motion be granted and Plaintiff's claims be dismissed with prejudice.

## BACKGROUND

The following facts are largely undisputed.[1] Plaintiff, a sixty-seven-year-old Chinese-American, has worked for the USPS

---

[1] Plaintiff does not dispute the basic facts presented by Defendant in Defendant's Rule 56.1 Statement; indeed most of Defendant's facts are taken from Plaintiff's own deposition testimony. Rather, Plaintiff's submissions provide additional facts regarding the circumstances of each act of allegedly discriminatory disciplinary action - facts not specifically disputed by Defendant. Therefore, although Defendant urges the Court to disregard all of Plaintiff's submissions in his responsive filings to Defendant's Motion for Summary Judgment, because Plaintiff failed to file a counter-statement of undisputed facts with correspondingly numbered paragraphs, as required by Local Civil Rule 56.1, the Court will accept and consider Plaintiff's submissions together with Defendant's Rule 56.1 Statement of undisputed material facts. See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) (holding that courts should independently review the record even if one party did not strictly adhere to the requirements of Local Rule 56.1); see also Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 74 (2d Cir. 2001) ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules"). Nonetheless, no evidence submitted by Plaintiff in his filing dated October 2, 2007, will be considered by the Court, as this submission came after the motions were fully submitted, and Plaintiff was not granted leave to file any supplementary papers. (See Memorandum Endorsed Order, dated Oct. 23, 2007.)

since 1997. (See Exhibit ("Ex.") C, Plaintiff's Deposition ("Pl.'s Dep."), at 70, annexed to Declaration of Matthew Schwartz ("Schwartz Decl."); see also Defendant's Rule 56.1 Statement ("Def.'s 56.1") ¶ 2.) Plaintiff began working in the Long Beach Post Office Branch ("Long Beach") as a registry clerk in 2000. (See Pl.'s Dep., at 101.) The registry clerk has primary responsibility for handling, sorting, and organizing "accountable mail" – mail that is registered, certified, priority, or Express Mail. (See id. at 15; Declaration of Francis O'Neill, dated June 29, 2007 ("O'Neill Decl."), ¶ 2.) Of particular importance to USPS is Express Mail, which USPS describes as its "premier product" because it has a guaranteed delivery time. (O'Neill Decl. ¶ 4.) If mistakes in handling accountable mail are made, the employee may be subject to disciplinary action. (See, e.g., Declaration of Sondra Harris ("Harris Decl.") ¶ 13.)

As described in greater detail below, Plaintiff alleges that under the direction of four different Postmasters, six supervisors took a total of ten disciplinary actions against Plaintiff over the course of four years; and, according to Plaintiff, these actions were based on his race, color, national origin, and age, or were in retaliation for filing complaints with the Equal Employment Opportunity Commission ("EEOC"). (See Complaint, 05 Civ. 8132, ¶¶ 4, 7; Complaint, 06 Civ 604, ¶¶ 4, 7.) After each disciplinary action, Plaintiff filed union grievances, two of which resulted in

3

binding arbitration and a written decision by the arbitrator.  Both times, the arbitrator sustained Plaintiff's grievances and, as a result, Plaintiff was reinstated to his job at Long Beach.

Plaintiff also filed three complaints with the EEOC: one was withdrawn, the second was dismissed without a hearing, and the third complaint was dismissed after a hearing.  The EEOC complaints were based on disciplinary actions which Plaintiff alleges were wrongfully taken, and thus, the product of discriminatory or retaliatory animus.

When a supervisor disciplines a postal employee, there is a five-step process.  (See Def.'s 56.1 ¶ 12; Harris Decl. ¶ 10.) First, the supervisor investigates whether there was misconduct on the part of the employee.  (Harris Decl. ¶ 10.)  Second, if the supervisor concludes there was a violation of the rules, a pre-disciplinary interview is held, consisting of a meeting between the supervisor, the employee, and the employee's union shop-steward or representative.  (Id.)  If the allegations are serious enough, the interview may also include other management officials, including the Postmaster.  (Id.)  Third, after the pre-disciplinary interview, if the supervisor determines that disciplinary action is necessary, then a Letter of Warning, Notice of Suspension, or Notice of Removal is prepared.  (Id.)  Fourth, the paperwork is

4

presented to the Postmaster or the Officer in Charge ("OIC")[2] to review, who must then concur in the supervisor's decision to discipline the employee. (Id.)  Finally, the employee is presented with disciplinary action.  (Id.)  The employee will then sign the document to indicate that it has been received, or the supervisor will sign if the employee refuses.  (Id.)

Once the USPS disciplinary process is completed, it may be followed up with a grievance from the postal worker's union. (Def.'s 56.1 ¶ 13; Harris Decl. ¶ 11.)  During the period of Plaintiff's employment, there was a four-step grievance process. (Harris Decl. ¶ 11.)  First, the supervisor would meet with the employee's shop steward to informally discuss the reason for the disciplinary action. (Id.)  Next, the Postmaster or OIC would meet with a higher-level union representative to informally resolve the issue. (Id.)  If there was still no settlement, a "district level" Postal Service Labor Relations Representative would meet with a union official. (Id.)  Finally, at the end of the process, if no settlement had been reached, the grievance could be submitted to binding arbitration. (Id.)

What follows is a description of each of the disciplinary actions taken against Plaintiff, the two grievances which resulted

---

[2] An OIC is similar to a temporary Postmaster. (See O'Neill Decl. ¶ 1.)

in arbitration decisions, and the three EEOC actions initiated by
Plaintiff.

I.    Plaintiff's Disciplinary History

    A.    June 2000 Letter of Warning

On June 16, 2000, Glenn Gregorio/Prekopa[3] ("Gregorio/Prekopa")
issued a Letter of Warning ("June 2000 LOW") to Plaintiff citing
two infractions: one for being late, the second for refusing to
fill out a form related to his being late.  (See Ex. "3B" annexed
to "Plaintiff's Affirmation in Opposition to Motion on 07/23/2007
by Defendant" ("Pl.'s Opp."); Pl.'s Dep., at 179.)  The June 2000
LOW listed nineteen separate occasions between January 30, 2000 and
May 24, 2000, when Plaintiff was allegedly late for work.  (See Ex.
3B.)  However, an "Absence Analysis" report by the Postal Service,
containing Plaintiff's official attendance record for the year
2000, shows only six instances of "Late Reporting" from January 1,
2000 until June 16, 2000; the report does not show that Plaintiff
was late on June 16, 2000.  (See Ex. 3 annexed to Pl.'s Opp.)[4]
Nonetheless, Plaintiff admitted to being three minutes late on June

_____

[3] The record identifies Gregorio/Prekopa as using both last
names.  (See Def.'s 56.1 ¶ 7.)

[4] As part of Plaintiff's "Exhibit 3B," along with the June
2000 LOW, Plaintiff also attached a notarized document, executed
by him, explaining each of the nineteen instances of alleged
lateness listed on the June 2000 LOW.  (See Ex. 3B, at
"GOV0003443-44.") However, it was executed on October 1, 2004,
nearly four years after the disciplinary incident, and after
Plaintiff had already been removed from his employment at Long
Beach.  (See Ex. 3B annexed to Pl.'s Opp.)

16, 2000, and admitted to refusing to sign the lateness form. (See Pl.'s Dep., at 179.)

This disciplinary action was a partial basis for Plaintiff's first EEOC complaint, which Plaintiff filed on December 18, 2000. (See Ex. J. annexed to Schwartz Decl. ("First EEOC Action").) However, on November 19, 2001, Plaintiff withdrew his first EEOC complaint. (See Ex. K annexed to Schwartz Decl.)

When asked why he thought the June 2000 LOW was discriminatory, Plaintiff said: "if it were not racial discrimination, what other reason would cause him to do that? I . . . don't know of any other reason." (Pl.'s Dep., at 214.) When pressed, he explained further: "Because he [Gregorio/Prekopa] treated other people differently. He treated me differently than he treated other people." (Id. at 215.)

B.    September 2000 Notice of Removal

On September 6, 2000, Plaintiff's then-OIC, Neil Mutarelli, issued a Notice of Removal ("September 2000 NOR") alleging that after being presented with the June 2000 LOW, Plaintiff refused to sign the acknowledgment of receipt, and, instead, tried to write his own explanation as to why he believed the discipline was undeserved. Gregorio/Prekopa alleged that, to prevent Plaintiff from writing on the Letter of Warning, he took the Letter of Warning back. Plaintiff then chased him, raised his voice, and grabbed his arm and shirt. (See Ex. 10 annexed to Pl.'s Opp.

(letter from Neil Mutarelli to Jeff Smith, dated Aug. 15, 2000, requesting assistance in drawing up a Notice of Removal); Ex. 12 annexed to Pl.'s Opp., Investigative Memorandum dated August 3, 2000 ("Aug. 2000 Mem.").)  Plaintiff denied any assault occurred, but admitted that he raised his voice, pointed his finger at Gregorio/Prekopa, and that, as he was pointing, Gregorio/Prekopa raised his arm and touched Plaintiff's finger. (See Aug. 2000 Mem. ¶ 3; Pl.'s Dep., at 199-200; see also Def.'s 56.1 ¶ 21.)  Most of the postal employees present, who witnessed the altercation, said that Plaintiff did not grab or assault Gregorio/Prekopa. (See Ex. 9 annexed to Pl.'s Opp. (letter signed by five employees stating that Plaintiff did not grab or use any violence towards Gregorio/Prekopa); see also Aug. 2000 Mem. ¶ 6.)

Plaintiff grieved the September 2000 NOR, and, as a result, it was reduced to a Letter of Warning for Unacceptable Conduct. (See Ex. 11 annexed to Pl.'s Opp. (letter to Mr. Puterio from Charles Spina, dated February 7, 2001, withdrawing the union's request for arbitration arising out of the 2000 NOR, and describing the agreement); see also Def.'s 56.1 ¶ 23.)  The September 2000 NOR was another act of discrimination alleged by Plaintiff in his first EEOC complaint. (See Ex. J. annexed to Schwartz Decl.)

When asked why he thought the disciplinary action was discriminatory, Plaintiff gave the same explanation as he did with the June 2000 LOW - because he was different, and was treated

differently by Gregorio/Prekopa: "I was the only one singled out for that. And the reason was my skin color. That's it." (Pl.'s Dep., at 220.)

    C.   The October 2001 Notice of Suspension

On October 29, 2001, Plaintiff received a Notice of Fourteen-Day Suspension ("October 2001 NOS") issued by Gregorio/Prekopa. Then-Postmaster Irving Kaminsky concurred. (See Pl.'s Dep., at 227-29.) The reason given for the suspension was that Plaintiff failed to report an accident involving an Airborne[5] deliveryman's truck, and a metal cart that rolled into it. (See id.) Plaintiff witnessed the accident and admitted that he did not file a report until the accident was investigated.[6] (See id. at 236.)

Plaintiff's union grieved the October 2001 NOS. The October 2001 NOS was later "unilaterally" reduced to an "official discussion." (See id. at 240; see also Ex. 13 annexed to Pl.'s Opp. (EEOC Investigation Report, dated June 13, 2002) ("June 2002 EEOC Report"), at 4.) Both parties agree that an "official discussion" is not discipline. (See Pl.'s Dep., at 240; Def.'s 56.1 ¶ 28.)

---

[5] Airborne is a third-party vendor of the Postal Service. (See Def.'s 56.1 ¶ 25.)

[6] Plaintiff was, at one point, accused of causing the accident; he then admitted he had witnessed the accident but not reported it. According to Plaintiff, the accident was caused by a broken safety chain that allowed the cart to roll into the Airborne truck. (See Pl.'s Dep., at 229.)

The October 2001 NOS was the subject of Plaintiff's second complaint with the EEOC, filed on June 10, 2002. (See Ex. L annexed to Schwartz Decl. ("Second EEOC Action"); June 2002 EEOC Report, at 1; Ex. M annexed to Schwartz Decl. ("2002 EEOC Decision").) That complaint was dismissed without a hearing. (See 2002 EEOC Decision.)

Plaintiff alleges that the October 2001 NOS, filed by Gregorio/Prekopa, was both discriminatory and done in retaliation for his first EEOC complaint, in which he accused Gregorio/Prekopa of discrimination. (See Pl.'s Dep., at 254.) When asked why he believed the action was discriminatory, Plaintiff described another accident, which he claimed an employee failed to report, that resulted in no disciplinary action. (See id. at 244.) The implication was that he was treated differently. Plaintiff could not say how he knew about the accident or how he knew it was not reported; he merely stated "you would have to investigate." (Id. at 246.) When pressed, Plaintiff stated: "I cannot think of [why the suspension was discriminatory] at this time." (Id. at 248.)

D.    September 2002 Letter of Warning

On September 26, 2002, Plaintiff was issued a Letter of Warning ("September 2002 LOW") from Sondra Harris ("Harris") concerning a piece of Registered Mail that was misplaced and then found in Plaintiff's registry room five months later. (See Pl.'s Dep., at 433.) At the time the mail was determined to be missing,

Plaintiff was told by a supervisor, Joe Kaminsky, to look for it; Plaintiff claims that he looked everywhere, but did not find it at that time. (See id. at 433-35.) Five months later, the letter was found by another employee in Plaintiff's registry room. (See id.)

Plaintiff asserts that he thought it was a "very, very serious matter," and took steps to try to determine what happened, but he consistently denied responsibility. (Def.'s 56.1 ¶ 33; Pl.'s Dep., at 433-39). Plaintiff maintains that another supervisor, Mary Ann Goldfinger ("Goldfinger"), lost the letter and then "framed" him for it. (See Pl.'s Opp., at 15.) Defendant takes the position that it was Plaintiff's registry cage and, thus, his responsibility. (See Def. 56.1 ¶ 34.)

This disciplinary action was not the subject of an EEOC complaint.

### E.   April 2003 Notice of Suspension

On April 18, 2003, Plaintiff was given a Notice of Seven-Day Suspension ("April 2003 NOS") by Goldfinger, which was concurred in by Postmaster O'Neill. Two reasons were given for the suspension: first, it was alleged that Plaintiff failed to follow instructions given to him by Goldfinger, and second, that Plaintiff caused a disturbance in front of other postal clerks and customers. (See Ex. D annexed to Schwartz Decl.) The Notice also referenced, as a "past element [that was] considered," the September 2002 LOW issued by Harris. (Id.) This Notice of Suspension was the first in a

11

string of five notices issued against Plaintiff by either Goldfinger or Harris, and concurred in by O'Neill.

The disturbance referred to in the Notice of Suspension arose from an incident on April 8, 2003. Towards the end of the work day, Plaintiff was told by Goldfinger to stop the work he was doing and to work on something else. (See Def.'s 56.1 ¶ 39; Pl.'s Dep., at 406-407; see also Ex. O annexed to Schwartz Decl. ("Pl.'s 2004 EEOC Aff.").) Plaintiff obeyed, but stopped to talk to another employee for a minute or two before doing the work he was assigned. (See Def.'s 56.1 ¶ 39.) Goldfinger got angry and ordered him to hurry up and do what she had told him to do. (See Pl.'s Dep., at 407-408.) Plaintiff obeyed. (See id.) However, part of his duties involved providing service to returning mail carriers, and there were five or six carriers lined up waiting for him. (See id. at 408.) So he stopped the work he was ordered to do, and went to help the carriers. (See id.) Goldfinger got angry, yelled at Plaintiff, and then ordered him to go home. (See id. at 409.) Plaintiff then gave her a short speech, which may have been audible to customers, and then left. (See id.) Plaintiff admitted: "properly speaking, both of us were liable for what happened. Well, to me, I should not have said things to her. That was my problem." (Id. at 410.)

Following a union grievance, the April 2003 NOS was reduced to a Letter of Warning. (See Pl.'s Dep., at 420.) This disciplinary

12

action was included in Plaintiff's third EEOC action, which was filed in February of 2004. (<u>See</u> Ex. N annexed to Schwartz Decl. ("Third EEOC Action").)

Plaintiff asserts the April 2003 NOS was discriminatory, but provides no explanation for his assertion (<u>see</u> Pl.'s Dep., at 430); rather, his focus is on describing this incident as retaliation for the lost letter incident, which formed the basis of the September 2002 LOW. (<u>See</u> <u>id.</u> at 442.)

F.  <u>May 2003 Notice of Suspension</u>

On May 8, 2003, Plaintiff was given a Notice of Fourteen-Day Suspension ("May 2003 NOS") by Harris, concurred in by O'Neill. The reasons given were that, on one occasion, Plaintiff improperly scanned an article of Express Mail as "attempted"; and on another occasion, Plaintiff incorrectly designated a piece of mail to go to the wrong address. (<u>See</u> Ex. E annexed to Schwartz Decl.; <u>see also</u> Def.'s 56.1 ¶ 48.)  Plaintiff admits that he made these errors. (<u>See</u> Pl.'s Dep., at 522, 525.)

Plaintiff's union grievance resulted in binding arbitration. (<u>See</u> Ex. 17 annexed to Pl.'s Opp. (decision by arbitrator sustaining the grievance, dated March 10, 2005) ("First Arbitration").)  The arbitrator sustained the grievance and specifically made a point of noting that Plaintiff was the only employee since 1995 to be disciplined for improperly scanning Express Mail as "attempted". (First Arbitration, at 1, 11.)

This disciplinary action was referred to by Plaintiff in the affidavit he filed in his Third EEOC Action, (see Ex O annexed to Schwartz Decl. ("Pl.'s Third EEOC Aff."), at 12), but was not specifically identified in his EEOC complaint. (See Third EEOC Action.)

Plaintiff argues that this discipline was discriminatory because the errors he committed were common, part of the job, and that he shouldn't have been singled out for punishment. (See Pl.'s Dep., at 525.)

G.    July 2003 Notice of Suspension

On July 2, 2003, Plaintiff received a Notice of Fourteen-Day Suspension ("July 2003 NOS"), issued by Harris and concurred in by O'Neill. (See Ex. F annexed to Schwartz Decl.) The July 2003 NOS was issued because Plaintiff did not give an article of Express Mail and an article of Priority Mail to the appropriate carriers, and, as a result, the mail was delivered late. (See id.) Harris claims that "this was a chronic problem with Song." (Harris Decl. ¶ 18.) Plaintiff denies it was a chronic problem, but admits that the mail was delivered late. He further argues that he did what was required of him under the circumstances, and that the supervisor was ultimately responsible for the mail being delivered late. (See Pl.'s Dep., at 452.) Plaintiff argues that because he was not responsible for the error, the discipline was discriminatory. (See id.)

14

Like the May 2003 NOS, this disciplinary action was referred to by Plaintiff in his affidavit filed with his Third EEOC Action, (see Pl.'s Third EEOC Aff., at 12), but was not specifically cited in the EEOC complaint. (See Third EEOC Action.)

H. August 2003 Notice of Suspension

On August 1, 2003, Plaintiff received a Notice of Fourteen-Day Suspension ("August 2003 NOS"), issued by Harris and concurred in by O'Neill. (See Ex. G annexed to Schwartz Decl.) The reason for this suspension was that a piece of Express Mail was not scanned properly. (See id.)

Plaintiff believes that he scanned the item properly, but speculates that before the data was saved, someone else might have used the scanner, causing the data to be lost. He also points to numerous problems with the scanners and the fact that they do not work properly 100% of the time. (See Pl.'s Dep., at 556.) In any event, the piece of mail was delivered on time. (See id. at 551-52, 555; see also Pl.'s 2004 EEOC Aff., at 15.)

This disciplinary action was referred to in Plaintiff's Third EEOC Action. (See Third EEOC Action.)

When asked why it was discriminatory, Plaintiff explained: "I'm not saying that I was the only one that was punished. I'm saying that a lot of people were punished, but they were light [sic] warning. But I'm the one who got the gravest punishment." (Pl.'s Dep., at 556.)

I.  <u>January 2004 Notice of Removal</u>

On January 20, 2004 Plaintiff received a Notice of Removal ("January 2004 NOR") issued by Michael Pagano ("Pagano") and concurred in by O'Neill.[7]  (<u>See</u> Ex. H annexed to Schwartz Decl.) There were three incidents of "Failure to Follow Instructions" cited as the reasons for the removal.  The first was for improperly scanning a piece of registered mail, the second and third were for failure to timely notify a supervisor that Express Mail had not been assigned to a carrier.  (<u>See</u> <u>id.</u>)  The January 2004 NOR also referenced the September 2002 LOW, the April 2003 LOW, the May 2003 NOS, the July 2003 NOS, and the August 2003 NOS.  (<u>See</u> <u>id.</u>)

Plaintiff claims that he properly scanned the mail, but that because the scanning device is available to others in the office, particularly supervisors, they could cause the scanned data to be lost.  Further, he contends that he notified supervisors when Express Mail was not assigned to a carrier, though he admits that on one occasion, his notice was not timely.  (<u>See</u> Pl.'s Dep., at 754-55, 762-64, 771.)  Thus, he claims that, ultimately, he was not at fault.  (<u>See</u> <u>id.</u>)

Plaintiff grieved his removal.  (<u>See</u> Ex. 24, annexed to Pl.'s Opp., Arbitration Award, dated March 7, 2005 ("Second Arbitration"); Third EEOC Action.)  Plaintiff's grievance was

---

[7] At the time, Pagano was aware of Plaintiff's past EEOC activity.  (<u>See</u> 2005 EEOC Decision at 4.)  O'Neill was not.  (<u>See</u> O'Neill Decl. ¶ 27.)

eventually sustained, and he was re-instated to his job; however, the arbitrator denied Plaintiff back-pay for the year of work he missed. (<u>See</u> Second Arbitration, at 15-16.)

Plaintiff also included this removal action in his Third EEOC Action. (<u>See</u> Third EEOC Action.)

Plaintiff argues that his removal was discriminatory "[b]ecause it was inappropriate punishment," and because it was the culmination of a plan to get rid of him. (Pl.'s Dep., at 776.) As Plaintiff explains it, after each disciplinary action against him, subsequent actions were progressively more severe. (<u>See</u> <u>id.</u> at 776-77.) Because the past disciplinary actions were for very minor errors - of low "quality" - Plaintiff argues that: "Even because they cited so many times quantity wise, they feel it's sufficient even if quality wise it's not. I think that's their plan, to take it one step at a time from the beginning to end. They reached their goal of firing me." (<u>Id.</u> at 777.)

J. <u>February 2004 Notice of Removal</u>

On February 10, 2004, Plaintiff received a second Notice of Removal ("February 2004 NOR") issued by Harris and O'Neill. (<u>See</u> Ex. I, annexed to Schwartz Decl.) The Notice cited two reasons: first, Harris cited Plaintiff for mis-scanning a piece of Express Mail (<u>see</u> <u>id.</u>); second, there was an altercation between Plaintiff and O'Neill involving Plaintiff's attempt to bid for a transfer to a different job. (<u>See</u> <u>id.</u>)

17

The confrontation between Plaintiff and O'Neill arose after Plaintiff attempted to submit a bid for a job that had been posted, but was then temporarily withdrawn by O'Neill "for typographical errors." (See Ex. U ("O'Neill EEOC Aff.") annexed to O'Neill Decl., at 4.) O'Neill returned Plaintiffs's bid to him because the job was not officially posted at the time that Plaintiff submitted his bid. (See Pl.'s EEOC Aff., at 13; O'Neill EEOC Aff., at 4.) Plaintiff went to O'Neill's office to give the bid back to him, and after a brief exchange, left the bid in O'Neill's office. (See Pl.'s Dep., at 594-95.) O'Neill followed Plaintiff back to where he was working, confronted Plaintiff, and attempted to return the bid. (See id. at 598-99.) Plaintiff refused to accept his bid back and insisted that it belonged to O'Neill, repeating "that's yours not mine." (Id.) Plaintiff acknowledged that both he and O'Neill were angry and spoke with raised voices. (See id. at 600.) They then separated and went back to work. (See O'Neill Decl. ¶ 21.)

The February 2004 NOR became effective March 20, 2004. As with the January 2004 NOR, Plaintiff's union grievance, also part of the Second Arbitration, eventually resulted in his reinstatement. (See Second Arbitration.) Plaintiff also included this removal in his Third EEOC Action. (See Third EEOC Action.)

Plaintiff argues that this final removal notice was discriminatory because he was treated differently, explaining:

"O'Neill was very strong on the fact that he wants to remove me. Within one month he sent me two notices of removal. This is unprecedented in the history of Long Beach Post Office." (Pl.'s Dep., at 622.) With regard to the past disciplinary actions, Plaintiff asserts that: "Of these six we know that none of them were excused or implemented later on. Some were simply dismissed. All of them were dismissed later. So what it shows that at the time he wrote the[] [removal notices] either he exaggerated or he had no basis to do so." (Id.) Thus, Plaintiff argues that from the April 2003 LOW until the February 2004 NOR, he was progressively given more harsh discipline for the purpose of firing him. (See id. at 777.)

II.  Plaintiff's Grievances and Reinstatement after Removal

Plaintiff's union grievances resulted in two written arbitration decisions, issued by an arbitration officer, Joseph Cannavo ("Cannavo" or "the arbitrator"). Cannavo's decisions were rendered after he conducted a hearing where testimony was presented by both the Postal Service and Plaintiff's Union, witnesses were subjected to cross-examination, and documentary evidence was submitted. (See id.)

A.  The First Arbitration Decision

The First Arbitration decision followed Plaintiff's grieving the May 2003 NOS (issued for improperly scanning an article of Express Mail as "attempted", and incorrectly designating mail to go

19

to the wrong address).  (<u>See</u> First Arbitration.)  The decision was issued on March 10, 2005.  (<u>See</u> <u>id.</u>)

At the hearing, the Postal Service reduced the Fourteen-Day Suspension to a Seven-Day Suspension, and then argued that it had cause to issue the suspension because Plaintiff failed to follow the rules and because of prior discipline.  (<u>See</u> First Arbitration at 3-4.)  The Union argued that, although Plaintiff had made an error, it resulted in no harm, and the suspension was too harsh under the circumstances.  (<u>See</u> <u>id.</u> at 5.)

Harris, the supervisor who issued the suspension, testified at the hearing.  (<u>See</u> <u>id.</u> at 6.)  She explained that the reason she issued the discipline to Plaintiff was because of "chronic" errors made by Plaintiff.  (<u>See</u> <u>id.</u>)  However, she also admitted that there were no references to any prior errors on the notice, nor was there any evidence that Plaintiff's errors were, in-fact, "chronic."  (<u>See</u> <u>id.</u>)  Harris further testified that she had been in the "reg room" (the registration room where Plaintiff worked) since 1995 and that, though other employees made the same errors as Plaintiff, she had never before issued discipline for this type of mistake.  (<u>See</u> <u>id.</u>)

In his decision, the arbitrator sustained the grievance and overturned the disciplinary action.  (<u>See</u> <u>id.</u> at 9.)  One reason cited by the arbitrator was that although Plaintiff made a mistake,

the error was understandable under the circumstances.[8] (See id. at 10.)  The arbitrator also rejected Harris's characterization of Plaintiff's mistakes as "chronic," and expressed "serious doubt as to whether or not the error regarding the Express Mail was his fault." (See id. at 11-12.)  The arbitrator noted that "[f]or the [Plaintiff] to be disciplined for these errors is openly and notoriously a demonstration of disparate treatment . . . the [Plaintiff] handles many many pieces of mail on a daily basis and for two pieces to be singled out and the [Plaintiff] to be punished with a two week suspension is obviously punitive. . . ." (See id. at 11.)

B.  The Second Arbitration Decision

The Second Arbitration decision followed Plaintiff's grieving the January and February 2004 NORs.  (See Second Arbitration, at 1.)  The hearing was held on November 2, 2004 and the decision was issued on March 7, 2005 (three days before the First Arbitration Decision was issued).  (See id.)  The Postal Service argued that the Notices of Removal were justified because Plaintiff failed to comply with the Rules and Regulations and exhibited improper conduct and behavior.  (See id. at 5-6.)  The Union argued that because the reliability of the scanner was suspect, Plaintiff should not be held accountable for mistakes that he may not have

---

[8] Plaintiff confused two very similar P.O. boxes and mis-delivered mail.

21

made.  Further, the Union argued that O'Neill was the instigator of the argument between himself and Plaintiff, and that Plaintiff twice walked away, but that O'Neill followed him and was therefore the cause of the disturbance.  (See id. at 11).

The arbitrator sustained the grievance.  (See id. at 12.)  The arbitrator found O'Neill's testimony regarding the confrontation lacked credibility, noting that no other employee present said that Plaintiff yelled at O'Neill.  (Yet, Plaintiff has conceded that both he and O'Neill spoke with "raised" voices.  (See Pl.'s Dep., at 600.)  Furthermore, the arbitrator believed that O'Neill was responsible for the incident because he engaged Plaintiff, twice, and was therefore responsible for what transpired afterward.  (See Second Arbitration, at 12.)

With regard to the errors made by Plaintiff, the arbitrator found that, according to information provided by the USPS, service-wide, only 94.12% of items of registered mail were properly scanned and 97.49% of certified items were properly scanned.  (See id. at 13.)  From this, and from the Postmaster's admission that scanning is not 100% accurate, the arbitrator concluded that a certain number of scanning errors are tolerated and expected by the USPS. (See id. at 14.)  He concluded that: "Given the number of pieces of mail [Plaintiff] scans on a daily basis, to single out 3 errors and to issue discipline can hardly be viewed as fair, equitable and non-discriminatory, given the fact that other employees obviously

engage in errors that are not willful but are simply mistakes. Furthermore, the record establishes that [Plaintiff] handles far more scanning pieces that any other employees [sic] at the Long Beach Office. . . [and] that percentage wise the [Plaintiff] has a much lower failure rate than many other employees who have not had action taken against them." (<u>Id.</u>)

The arbitrator also stated that "[Plaintiff's] relationship with Management is contentious and that [Plaintiff] has contributed to this atmosphere," and noted both Plaintiff and management were "equally hostile." (<u>Id.</u> at 15.) Because of Plaintiff's conduct, and because he failed to mitigate his damages, the arbitrator declined to award him back-pay for the time between his removal from Long Beach until his reinstatement. (<u>See</u> <u>id.</u> at 15-16.)

III.  <u>The EEOC Actions and Decision</u>

Plaintiff filed three actions with the EEOC. The First EEOC Action was filed on December 18, 2000 and concerned the June 2000 LOW and the September 2000 NOR. (<u>See</u> First EEOC Action.) Plaintiff asserted both Title VII and ADEA discrimination, as well as retaliation claims.[9] (<u>See</u> <u>id.</u>) On November 19, 2001, Plaintiff voluntarily withdrew his complaint without any decision being issued. (<u>See</u> Ex. K annexed to Schwartz Decl.)

---

[9] However, as Defendant points out, it does not appear that Plaintiff claimed retaliation for protected employment activity, but rather, "retaliation" based on the incidents themselves. (<u>See</u> Def.'s 56.1 ¶ 18.)

23

The Second EEOC Action concerned the October 2001 NOS.  (See 2002 EEOC Decision, at 1.) Following a union grievance, the USPS reduced the October 2001 NOS to an "official discussion."  In reviewing the EEOC Complaint, the Administrative Law Judge ("ALJ") concluded: "an official discussion is not an adverse employment action," citing to other EEOC decisions.  (See id. at 3.) Additionally, the ALJ concluded, that "[Plaintiff] failed to establish that it is more likely than not that the agency discriminated by issuing [the October 2001 NOS]."  (2002 EEOC Decision, at 5.)  The ALJ dismissed the claim and issued his opinion after an investigation, but without a hearing.  (See id.) Plaintiff then received a right-to-sue letter.  (See id.)

On February 3, 2004, Plaintiff filed his third EEOC Complaint of Discrimination, which encompassed multiple adverse disciplinary actions.  (See Third EEOC Action.)  On the complaint form, Plaintiff specifically listed the April 2003 NOS, the August 2003 NOS, and the January 2004 NOR.[10]  (See id.)  Plaintiff also listed "from 01/2003 to now" as the dates for the actions of which he was complaining.  In addition, Plaintiff's affidavit referred to the May 2003 NOS and the July 2003 NOS, as did the ALJ in his decision. (See Pl.'s Third EEOC Aff., at 12; 2005 EEOC Decision, at 3.) However, in the introductory paragraph of the 2005 EEOC Decision,

---

[10]    The complaint was later expanded to include the February 2004 NOR.  (See 2005 EEOC Decision.)

the ALJ did not identify the May 2003 NOS and the July 2003 NOS as among those which the ALJ addressed in his decision.  (See id. at 1.)

On October 26, 2005, a few weeks before the arbitrator's decisions, the ALJ issued a decision finding that Plaintiff failed to meet his burden of establishing that he was discriminated against because of his race, color, national origin, or age, or in retaliation for prior EEOC activity.  The reason the ALJ gave was that Plaintiff failed to establish that any similarly situated individuals outside of his protected group received more favorable treatment.  (See id. at 4.)  With regard to the retaliation claim, the ALJ found no nexus between the only supervisor with knowledge of Plaintiff's past EEOC activity, Pagano, and the disciplinary actions taken by the USPS.  (See id.)  Plaintiff was issued a right-to-sue letter after the ALJ denied his claim.  (See id. at 6.)

## DISCUSSION

Plaintiff's argument in support of his case can be summarized as a syllogism: Plaintiff was unfairly and wrongly disciplined; he was the only older Chinese-American employee at Long Beach; therefore, he was disciplined by Long Beach supervisors because he was an older Chinese-American.  In support of his claims, Plaintiff has presented evidence that each individual act of discipline was unfair, unjustified, and different from what other employees faced

25

- even while admitting that he had some responsibility for the errors for which he was disciplined.  Plaintiff appears to argue that even if he made the errors, the actual motive for Defendant's actions was impermissible discrimination, at least in part, as evidenced by the unfair and uniquely harsh nature of the discipline.[11]

Defendant, addressing Plaintiff's claims individually, argues that each should be dismissed for one of two reasons.  First, Defendant argues that particular claims should be dismissed because they were not exhausted before the EEOC.  Second, Defendant argues that Plaintiff has not provided any evidence from which a rational factfinder could infer that the disciplinary actions were taken because of his race, color, national origin, age, or prior EEOC activity, or that the non-discriminatory reasons asserted by Plaintiff's supervisors to justify their actions were pretextual.

As explained in greater detail below, the Court finds that Plaintiff has failed to meet his ultimate burden of linking the actions taken by his supervisors to discriminatory animus based on his status as an older Chinese-American.  The Court also finds that, with regard to Plaintiff's retaliation claims, Plaintiff has

---

[11] Plaintiff does not make this argument directly; nonetheless, it is strongly implied in his deposition (see Pl.'s Dep., at 622, 777), and legally feasible.  See Henry v. Daytop Village, Inc., 42 F.3d 89, 94-95 (2d Cir. 1994) (noting that the plaintiff's own misconduct may have been immaterial to whether the defendant treated the plaintiff differently from white employees who were accused of similar misconduct).

failed to meet his burden of linking Defendant's adverse employment actions with his protected employment activities.

I. Summary Judgment Standards

Under Rule 56(c) of the Federal Rules of Civil Procedure, a motion for summary judgment may not be granted unless the Court determines that there is no genuine issue of material fact to be tried, and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552-53 (1986); Salahuddin v. Goord, 467 F.3d 263, 272-73 (2d Cir. 2006). The burden of demonstrating the absence of any genuine dispute as to material facts rests upon the party seeking summary judgment. See Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970). Once a properly supported motion for summary judgment has been made, the burden shifts to the non-moving party to make a sufficient showing to establish the essential elements of that party's case on which it bears the burden of proof at trial. Hayut v. State Univ. of N.Y., 352 F.3d 733, 743 (2d Cir. 2003). The non-moving party must put forth "specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e). In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, courts are required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought. See

27

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986); Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004).

When a case is fact-intensive and turns on the intent of one party, as employment discrimination cases often do, "trial courts must be especially chary in handing out summary judgment." Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 87 (2d Cir. 1996); accord Feingold v. New York, 366 F.3d 138, 149 (2d Cir. 2004). The trial court is under a duty in such cases to carefully scrutinize the record for circumstantial evidence that could support an inference of discrimination. See Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. "The issue of material fact required . . . to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." Kessler v. Westchester County Dep't of Social Servs., 461 F.3d 199, 206 (2d Cir. 2006) (quoting Anderson, 477 U.S. at 248-49) (internal quotation marks omitted).

28

Nevertheless, even in discrimination cases, "conclusory allegations of discrimination are insufficient to satisfy the requirements of Rule 56(e)." <u>Meiri v. Dacon</u>, 759 F.2d 989, 998 (2d Cir. 1985); <u>accord</u> <u>Schwapp v. Town of Avon</u>, 118 F.3d 106, 110 (2d Cir. 1997). An important purpose of summary judgment — "avoiding protracted, expensive and harassing trials — appl[ies] no less to discrimination cases" than to other types of cases. <u>Meiri</u>, 759 F.2d at 998; <u>see also</u> <u>Abdu-Brisson v. Delta Air Lines, Inc.</u>, 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases."), <u>cert. denied</u>, 534 U.S. 993, 122 S. Ct. 460 (2001). A plaintiff must "come forward with enough evidence to support a jury verdict in [his] favor, and the motion will not be defeated merely . . . on the basis of conjecture and surmise." <u>Trans Sport, Inc. v. Starter Sportswear, Inc.</u>, 964 F.2d 186, 188 (2d Cir. 1992). "Speculation alone is insufficient to defeat a motion for summary judgment." <u>McPherson v. New York City Dep't of Educ.</u>, 457 F.3d 211, 215 n.4 (2d Cir. 2006) (citing <u>Ying Jing Gan v. City of New York</u>, 996 F.2d 522, 532 (2d Cir. 1993)).

The Court will first address Defendant's argument that Plaintiff failed to exhaust his administrative remedies as to particular claims. Next, the Court will address the discrimination claims and, finally, the retaliation claims.

II. <u>Exhaustion of Administrative Remedies</u>

    A.  <u>Legal Standards</u>

Defendant first argues that certain claims should be dismissed for failure to exhaust administrative remedies. Individuals bringing suit for discrimination under Title VII and the ADEA must first assert their claims before the EEOC. <u>See</u> 42 U.S.C. § 2000e-5(f)(1) (Title VII); 29 U.S.C. § 626(d) (ADEA); <u>McPherson</u>, 457 F.3d at 213. Under Title VII, a plaintiff must also receive a "right-to-sue" letter from the EEOC. <u>See</u> 42 U.S.C. § 2000e-5(f)(1); <u>see also</u> <u>McPherson</u>, 457 F.3d at 213. However, no "right-to-sue" letter is needed in ADEA cases, "so a complainant may exhaust the administrative process by withdrawing agency charges so long as the charge was pending with the EEOC for at least 60 days." <u>McPherson</u>, 457 F.3d at 215 (citing <u>Holowecki v. Fed. Express Corp.</u>, 440 F.3d 558, 563 (2d Cir. 2006)); <u>see also</u> <u>Hodge v. N.Y. Coll. of Podiatric Med.</u>, 157 F.3d 164, 168 (2d Cir. 1998).

    B.  <u>Application</u>

Only one of the disciplinary actions taken against Plaintiff was never the subject of an EEOC Complaint – the September 2002 LOW. Because a complaint must be filed with the EEOC before an action may be brought in a federal court, the September 2002 LOW, as a stand-alone claim of discrimination or retaliation, should be dismissed for failure to exhaust administrative remedies. <u>See generally</u> <u>McPherson</u>, 457 F.3d at 213.

Defendant argues that the claims asserted by Plaintiff in the First EEOC Action - the June 2000 LOW and the September 2000 NOR - should also be dismissed for failure to exhaust administrative remedies because Plaintiff voluntarily withdrew his administrative complaint.[12] Because a "right-to-sue" letter is required before any complaint may be brought pursuant to Title VII, and Plaintiff withdrew the EEOC complaint before a right-to-sue letter issued, the Title VII claims asserted in his First EEOC Action should be dismissed. See Francis v. City of New York, 235 F.3d 763, 768 (2d Cir. 2000) ("right-to-sue" letters are conditions precedent to suit); see also McPherson, 457 F.3d at 214; Randall v. Potter, No. 05 Civ. 6490(KMW)(KNF), 2007 WL 3374586, at *4 (S.D.N.Y. Sept. 26, 2007).

However, to the extent that Plaintiff alleged claims of age discrimination under the ADEA in his First EEOC Action, those claims are not barred for failure to exhaust. In McPherson, although the claimant withdrew her ADEA claim after it had been pending with the EEOC for more than sixty days, see 457 F.3d at 215, the Second Circuit held that the claim was exhausted. See id. Here, Plaintiff withdrew his EEOC complaint, which included an ADEA claim, on November 19, 2001, almost eleven months after it was

---

[12] Defendant cites the withdrawal of the complaint as the reason to dismiss these claims; however, the actual bar to recovery is that, by withdrawing his complaint, Plaintiff did not receive a "right-to-sue" letter. See McPherson, 457 F.3d at 214.

filed.  (See Ex. J annexed to Schwartz Decl.;  Ex. K annexed to Schwartz Decl.)  Thus, the June 2000 LOW and the September 2000 NOR, to the extent that they allege age discrimination under the ADEA, are exhausted.  See McPherson, 457 F.3d at 215.

Finally, Defendant argues that Plaintiff failed to exhaust his claims regarding the May 2003 NOS and July 2003 NOS.  Defendant appears to believe that because those two disciplinary actions were not separately listed by Plaintiff in his Third EEOC Complaint, they were not exhausted.  However, there are three reasons to reject Defendant's argument.  First, Plaintiff wrote on his initial complaint form, under the category "Date on which the alleged acts of Discrimination took Place," "from 01/2003 to now;" second, he referred to the claims in his Third EEOC Affidavit; and third, the ALJ referred to the claims in his decision.[13]  (See Third EEOC Action.; 2005 EEOC Decision.)  In addition, the final sentence of the 2005 EEOC Decision states: "Viewing the record in its entirety, I find that the Complainant has failed to meet his burden of proving race, national origin, color, age or retaliation discrimination."  (2005 EEOC Decision, at 5 (emphasis added).)

Because Plaintiff referred to the actions in his affidavit, and the ALJ considered the May 2002 NOS and the July 2003 NOS in

---

[13] Defendant incorrectly asserts that the May 2003 NOS and the July 2003 NOS were not mentioned in the ALJ's decision.  (See Defendant's Reply Memorandum of Law in Further Support of Defendant's Motion for Summary Judgment, at 11.)  They were. (See 2005 EEOC Decision, at 3.)

his decision, the Court concludes that these claims were presented to, and considered by, the ALJ.  Therefore, the May 2003 NOS and the July 2003 NOS claims were properly exhausted.  See Williams v. New York City Housing Auth., 458 F.3d 67, 70 (2d Cir. 2006) ("The central question is whether the complaint filed with the EEOC gave that agency adequate notice to investigate [the] discrimination [claims]"); Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 177-78 (2d Cir. 2005) (finding it was error not to consider claims simply because they were omitted from the EEOC complaint).

III.  Discrimination Claims

    A.  Legal Standards

    The standards for adjudicating motions for summary judgment on employment discrimination claims brought pursuant to Title VII and ADEA are well established.  Such claims are governed by the burden-shifting analysis developed by the Supreme Court in McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973).  See, e.g., Wanamaker v. Columbian Rope Co., 108 F.3d 462, 465 (2d Cir. 1997) (applying McDonnell-Douglas to ADEA claim); Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996) (applying McDonnell-Douglas to Title VII retaliatory discharge claim).  Under this framework, the plaintiff must first establish a prima facie case of discrimination.  See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506, 113 S. Ct. 2742, 2746-47 (1993); Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S. Ct.

1089, 1093 (1981); McDonnell-Douglas, 411 U.S. at 802, 93 S. Ct. at 1824.

To establish a prima facie case of race or age discrimination, "a claimant must demonstrate that: 1) he was within the protected [class or] age group; 2) he was qualified for the position; 3) he was subject to an adverse employment action; and 4) the adverse action occurred under circumstances giving rise to an inference of discrimination." Terry v. Ashcroft, 336 F.3d 128, 137-38 (2d Cir. 2003); see also Collins v. N.Y.C. Transit Auth., 305 F.3d 113, 118 (2d Cir. 2002); Roge v. NYP Holdings, Inc., 257 F.3d 164, 168 (2d Cir. 2001). A plaintiff's burden, which must be met when asserting a prima facie case, is minimal. See Tomassi v. Insignia Fin. Group, Inc., 478 F.3d 111, 114 (2d Cir. 2007) (describing the burden as "de minimis"); Jute, 420 F.3d at 174.

Once the plaintiff has carried this initial burden, the burden of production then shifts to the defendant to proffer a legitimate, non-discriminatory reason for the challenged employment action. Hicks, 509 U.S. at 506-07, 113 S. Ct. at 2747; Burdine, 450 U.S. at 253, 101 S. Ct. at 1093; McDonnell-Douglas, 411 U.S. at 802, 93 S. Ct. at 1824. The defendant need not prove by a preponderance of the evidence that the reasons for its actions were not discriminatory, since the burden of persuasion remains with the plaintiff throughout the case; rather, the defendant must simply

present clear and specific non-discriminatory reasons for its
actions. See Burdine, 450 U.S. at 254-58, 101 S. Ct. at 1094-96.

Finally, once the defendant has presented a legitimate reason
for its actions, the presumption of discrimination raised by the
plaintiff's prima facie showing "drops out of the picture." Hicks,
509 U.S. at 511, 113 S. Ct. at 2749; see also Joseph v. Leavitt 465
F.3d 87, 90 (2d Cir. 2006). The plaintiff must then be given an
opportunity to demonstrate that the defendant's stated reasons are
merely a pretext for discrimination. See McDonnell-Douglas, 411
U.S. at 804, 93 S. Ct. at 1825; Burdine, 450 U.S. at 253, 101 S.
Ct. at 1093; Patterson v. County of Oneida, 375 F.3d 206, 221 (2d
Cir. 2004).

"'The ultimate burden of persuading the trier of fact that the
defendant intentionally discriminated against the plaintiff remains
at all times with the plaintiff." Joseph, 465 F.3d at 90 (quoting
James v. New York Racing Ass'n, 233 F.3d 149, 153-54 (2d Cir.
2000)). On a motion for summary judgment, "the plaintiff's
admissible evidence must show circumstances that would be
sufficient to permit a rational finder of fact to infer that the
defendant's employment decision was more likely than not based in
whole or in part on discrimination." Stern v. Trs. of Columbia
Univ., 131 F.3d 305, 312 (2d Cir. 1997); accord Feingold, 366 F.3d
at 152. "[S]peculation alone is insufficient to defeat a motion for
summary judgment." McPherson, 457 F.3d at 215 n.4; Ying Jing Gan,

35

996 F.2d at 532 (holding that non-moving parties "may not rely simply on conclusory statements" to defeat summary judgment). Unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination, the employer will be entitled to summary judgment.  See Joseph, 465 F.3d at 90.

    B.  Application

        1.  Prima Facie Case of Discrimination

Defendant appears to have conceded, and the record supports the conclusion, that: 1) Plaintiff was within a protected class or age group; 2) he was qualified for his position as registry clerk; and 3) he was subject to adverse employment actions.  Thus, the only element of a prima facie case at issue here is whether the adverse actions taken by Plaintiff's supervisors occurred under circumstances giving rise to an inference of discrimination.

When asked, Plaintiff could not point to any evidence to support his claim that the reason he was disciplined was because of impermissible discrimination.  Rather, Plaintiff argues that because, by his own estimation, he was unfairly disciplined, there is no explanation for the discipline other than discrimination. (See, e.g., Pl.'s Dep., at 214.)

Defendant argues that Plaintiff's admission that he has no evidence of discrimination, other than his own conclusions, is proof that there are no facts from which an inference of discrimination could be drawn.  Defendant also points to

Plaintiff's own admissions that none of his supervisors ever commented to him about his race, skin color, national origin, or age. (<u>See, e.g.</u>, Pl.'s Dep., at 251, 285, 314-15, 354, 629, 988.) Finally, Defendant notes that Plaintiff admitted that another Chinese clerk got along with Long Beach supervisors, as did the other older postal workers. (<u>See</u> <u>id.</u> at 215-16, 220.)  Defendant argues that, in sum, Plaintiff's admissions would preclude a factfinder from drawing a reasonable inference of discrimination with respect to the disciplinary actions taken against Plaintiff.

A common method of establishing an inference of discrimination is showing that the employer treated a similarly situated employee differently. <u>McGuinness v. Lincoln Hall</u>, 263 F.3d 49, 53 (2d Cir. 2001) (quoting <u>Abdu-Brisson</u>, 239 F.3d at 468).  Despite Plaintiff's admission in his deposition that he lacks hard evidence of discrimination, and his admissions that other employees within his protected class were not discriminated against, Plaintiff has provided some evidence indicating that he was treated differently than other employees.  First, Plaintiff has submitted evidence consisting of disciplinary actions, or "cases," taken against other employees at Long Beach for infractions similar to those actions taken against Plaintiff. (<u>See</u> "The Supplemental Material Documents to support my 'Plaintiff's affirmation in Opposition to Motion on 07/23/2007 by Defendant' on 08/20/2007" dated Sept. 12, 2007 ("Pl.'s Supp."), at "cases" 1-12; <u>see also</u> Ex's. 23 & 32 annexed to

37

Pl.'s Opp.)  In a number of cases, it appears that when other employees were disciplined for infractions similar to those brought against Plaintiff, their discipline was less severe.

Here, however, it is difficult to conclude from Plaintiff's comparative "cases" that Plaintiff was treated more harshly than similarly-situated employees who were younger or not Chinese, because Plaintiff's position at Long Beach was somewhat unique. (See Pl.'s Dep., at 860.)  Moreover, neither the names of the employees, nor their ages or races, appear on the disciplinary actions in Plaintiff's "cases".  In light of this evidentiary limitation, together with Plaintiff's admissions that neither other older employees, nor another Chinese employee, were also discriminated against, the various comparative disciplinary "cases" provided by Plaintiff have limited value.

Furthermore, assuming arguendo that Plaintiff's "cases" represent similarly-situated employees, they offer little support for Plaintiff's case.  Rather, they appear to show a pattern of increasing discipline issued to other employees, based on a prior history of discipline, or more severe discipline because of the seriousness of the misbehavior.  (See, e.g., Ex. 23 annexed to Pl.'s Opp., at GOV 12255-56,[14] GOV 12022-23, GOV 12025-26 (showing that if employees had two prior disciplinary actions for a similar

---

[14] "GOV" numbers are the identifying numbers on documents provided to Plaintiff by Defendant.

infraction, they were given seven-day suspension notices); see also
id. at GOV 12632-33 (a notice of removal against an employee for
"Creating a Hostile Work Environment/Unacceptable conduct,"
relating to a physical altercation with another employee.)  The
discipline in these cases resembles the actions taken against
Plaintiff, rather than pointing to disparate treatment.  These
cases also tend to show that the level of discipline is tied to
factors other than the identity of the employee being disciplined.
The only difference between Plaintiff's situation and the cases he
submitted to the Court, is that none of the cases show an employee
being removed from employment solely for mishandling pieces of
Express Mail - as alleged in the January 2004 NOR.  Thus, there is
little useful comparative evidence to support Plaintiff's claims.

If there are no other similarly-situated employees from which
a direct comparison may be made, "other indicia of discrimination"
can be used to establish discriminatory intent.  Abdu-Brisson 239
F.3d at 468.  As other indicia of discrimination, Plaintiff has
submitted the two arbitration decisions which resulted from his
union grievances.[15]  Both of those decisions specifically noted that

---

[15] The United States Supreme Court has held that arbitration
decisions arising from grievance-arbitration clauses in
collective-bargaining agreements "may be admitted [in employment
discrimination cases,] as evidence and accorded such weight as
the court deems appropriate."  Alexander v. Gardner-Denver Co.,
415 U.S. 36, 60, 94 S. Ct. 1011, 1025 (1974); accord Ledbetter v.
Goodyear Tire & Rubber Co., Inc., __U.S.__, 127 S. Ct. 2162, 2170
U.S. (2007); see also Wright v. Universal Maritime Serv. Corp.,
525 U.S. 70, 74-77 119 S. Ct. 391, 395-96 (1998) (addressing the

Plaintiff was being treated in a discriminatory fashion.[16]

The arbitration decisions both cite to evidence presented to the arbitrator indicating that Plaintiff was treated differently. The arbitrator specifically used the words "disparate treatment" and "discriminatory" to describe the disciplinary actions taken against Plaintiff in comparison to other employees and in light of the unique nature of Plaintiff's job. (See First Arbitration, at 11; Second Arbitration, at 14.)  In particular, the arbitrator noted that Plaintiff handles far more accountable mail than any other employee, and, thus, based on volume alone, Plaintiff would be more likely to make mistakes. (See Second Arbitration, at 14.) The arbitrator's view was that, though Plaintiff made more

---

differences between the preclusive effect of arbitration clauses in the Title VII context and in the ADEA context).  The Second Circuit, applying Alexander, has held that where "a decision of an independent and unbiased arbitrator [is] based on substantial evidence after a fair hearing, the arbitration decision has probative weight regarding the requisite causal link between an employee's termination and the employer's illegal motive." Collins v. New York City Transit Authority, 305 F.3d 113, 115 (2d Cir. 2002) (citing Alexander, 415 U.S. at 60); see also Tomasino v. Mount Sinai Med. Ctr. & Hosp., No. 97 Civ. 5252 (TPG), 2003 WL 1193726, at *10-12 (Mar. 13, 2004) (applying Alexander and Collins to an arbitration decision which found that an employee's termination was unjustified).  It appears from the decisions offered by Plaintiff that the arbitrator was unbiased, and independent, and conducted a fair hearing.  Thus, the Court will afford some probative weight to the facts and conclusions contained within the two arbitration decisions provided by Plaintiff.

[16] Therefore, Defendant's contention that there is not "even a scintilla of evidence of discrimination," is not accurate. (See Defendant's Memorandum of Law in Support of Defendant's Motion for Summary Judgment ("Def.'s Mem."), at 19.)

mistakes, they should be expected as part of his job, and therefore do not justify higher levels of discipline.  (See id.)

In reaching this conclusion, the arbitrator relied on evidence and statements presented by the Postal Service itself, and the supervisors who actually issued the discipline.  Furthermore, there is no evidence to suggest that the arbitrator was not independent, neutral, and unbiased.  The purpose of the arbitration hearings was to determine whether Plaintiff's supervisors were justified in taking disciplinary actions against the Plaintiff.  One issue before the Court in this case is substantially similar – whether Plaintiff can show that Defendant was unjustified in issuing the discipline, thereby raising an inference of discrimination.  The Court therefore finds that, under these circumstances, the conclusion in the two arbitration decisions that Plaintiff was being treated differently, is sufficiently probative to give rise to an inference of discrimination, thereby allowing Plaintiff to satisfy the de minimus burden of establishing a prima facie case of discrimination.  Cf. Collins, 305 F.3d at 119 (finding that a decision by an independent, neutral, and unbiased adjudicator that employee was not discriminated against was "highly probative"); Tomasino, 2003 WL 1193726 at *13 (adopting the findings of the arbitrator and giving them "great weight").

However, not all of Plaintiff's claims are sufficiently supported to make out a prima facie case of discrimination.  Only

for those claims addressed by the arbitration decisions – the May 2003 NOS (improper scanning and incorrectly designating mail), the January 2004 NOR (improper scanning and failing to notify a supervisor of unassigned mail), and the February 2004 NOR (improper scanning and the altercation with the Postmaster) – has Plaintiff met his minimal burden to come forward with a prima facie case of discrimination.  See Tomassi, 478 F.3d at 114.

Plaintiff's remaining claims, therefore, to the extent they are asserted as stand-alone claims, should be dismissed.  Plaintiff has pointed to no evidence from which an inference could be drawn that the June 2000 LOW (being late) and the September 2000 NOR (improper conduct) ADEA claims, or the October 2001 NOS (failure to report an accident), the April 2003 NOS (failure to follow instructions and causing a disruption), the July 2003 NOS (failure to timely notify supervisors of unassigned mail), or the August 2003 NOS (improper scanning mail) claims, were motivated by impermissible factors such as Plaintiff's race or age.  As noted before, Plaintiff's comparative evidence and his own conclusory statements are simply insufficient to support any inference that each action was taken because of impermissible discrimination.  In addition, Plaintiff has admitted that he made many of the mistakes for which he was disciplined, and that other people in his protected class are not treated differently.  Thus, except for the three claims addressed by the two arbitration decisions,

Plaintiff's remaining claims, as stand-alone claims of discrimination, should be dismissed because Plaintiff has failed to present a prima facie case of discrimination.

Before continuing to the next step in the McDonnell-Douglas analysis, it should be noted that, although some of Plaintiff's claims do not survive on their own, they were also cited as reasons for the three disciplinary actions which do survive on their own. Because Plaintiff alleges that Defendant wanted to fire Plaintiff for allegedly impermissible reasons, each individual action can be viewed as evidence of a pattern of behavior indicating that Plaintiff was fired because of his race, color, national origin, age, or prior EEOC activity. The Court will therefore consider all of Plaintiff's claims as part of the evidence of the treatment Plaintiff was subjected to when evaluating Plaintiff's surviving claims, even if they are not adequate stand-alone claims. See Garvin v. Potter, 367 F. Supp. 2d 548, 571 (S.D.N.Y. 2005) (holding that though a singular disciplinary action might not support a prima facie case, when viewed as a pattern, evidence of letters of warning, suspensions, and notices of removal were sufficient to survive summary judgment.)

## 2. Defendant's Justification

Defendant has offered legitimate non-discriminatory reasons for the disciplinary actions it took against Plaintiff, and argues that each action was grounded in actual mistakes made, and admitted

to, by Plaintiff.  Further, Defendant argues that the escalating level of discipline was based not only on past disciplinary actions, but also Plaintiff's attitude, and his general poor performance.  Indeed, Plaintiff has admitted that his actions and behavior contributed to feelings of hostility between himself and management.

Defendant has therefore come forward with legitimate, non-discriminatory reasons for the actions taken against Plaintiff, and the presumption of discrimination raised by Plaintiff now drops out of the picture.  Hicks, 509 U.S. at 511, 113 S. Ct. at 2749; see also Joseph, 465 F.3d at 90.  Plaintiff must now come forward with some evidence indicating that Defendant's stated reasons were merely a pretext for discrimination.  Hicks, 509 U.S. at 511, 113 S. Ct. at 2749.  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  Burdine, 450 U.S. at 253, 101 S. Ct. at 1093.

### 3.  Plaintiff's Ultimate Burden

Although the Court has concluded that the arbitration decisions enable Plaintiff to satisfy the minimal burden of presenting a prima facie case of discrimination, they do not, by themselves, raise a disputed issue of material fact on the ultimate question of whether Defendant engaged in impermissible discrimination - that is discrimination based on race, national

origin, color, or age.   There is nothing in the arbitration decisions to suggest that the discriminatory treatment they refer to was based on impermissible factors such as Plaintiff's race or age.  Lay persons often identify actions as discriminatory when one employee is treated more harshly than another, regardless of race, age, or gender.   Here, however, there is no evidence that impermissible motives were part of the decisions and actions taken by Plaintiff's supervisors.

Moreover, the arbitration decisions conclude, and Plaintiff admits, that Plaintiff had some responsibility for the poor relations between himself and Long Beach management, and Defendant cites to Plaintiff's attitude as a reason why he was frequently disciplined.  Although Plaintiff may have been fairly or unfairly subjected to harsher discipline because his supervisors did not like his attitude, and they may have found a way to magnify small errors into a reason to remove Plaintiff, the arbitration decisions do not provide any evidence that the reason was because of impermissible discrimination.

In addition, the Court does not view the arbitrator's subjective conclusions - finding it unfair and discriminatory to subject Plaintiff to discipline every time he mishandles mail because he handles more accountable mail than other employees as part of his job - as being entitled to great weight.  Because it is Plaintiff's job to handle accountable mail exclusively, it is not

necessarily unfair for management to hold him to a higher standard than an employee who only fills in for him occasionally, and who reasonably might be expected to make more mistakes. Although the arbitration decisions describe some of Plaintiff's mistakes as minor errors in light of the volume of mail Plaintiff handles, USPS legitimately perceived these errors as a problem. It was Plaintiff's job to handle the accountable mail properly, and his failure to do so was a legitimate ground for discipline.

The arbitration decisions also do not provide evidence that the reasons given by Defendant for disciplining Plaintiff are merely pretextual. To the contrary, they reinforce Defendant's position that Plaintiff was, at times, a difficult employee. The arbitrator also observed that Plaintiff and his supervisors were equally hostile, and that Plaintiff contributed to the hostile atmosphere. (See Second Arbitration, at 15.) Even the ALJ in the Third EEOC action noted that Plaintiff had a hard time listening to instructions. (See 2005 EEOC Decision, at 4.) Ultimately, as discussed, although the arbitration decisions describe the disciplinary actions taken as unfair and "discriminatory," they do not point to, or even suggest that it was because of Plaintiff's status as an older Chinese-American.

The evidence presented by Plaintiff, including the prior disciplinary actions, even when viewed as a pattern of actions taken with the intended result of Plaintiff's removal from the

Postal Service, is insufficient to create a material issue of fact as to whether he was discriminated against because he was an older Chinese-American.  Although Plaintiff challenges the fairness of each of the disciplinary actions, and, at times, whether he was truly at fault, he does not deny that he made mistakes and that he shared some responsibility for the difficult relationship he had with his supervisors.

Furthermore, there is no evidence that discriminatory remarks were ever made to Plaintiff by any of the six different supervisors who took disciplinary action,[17] or the four different Postmasters who concurred in those actions.  Plaintiff has also admitted that the other Chinese employee, and the other older employees, were not discriminated against by Long Beach supervisors.

In sum, there is no evidence that Plaintiff, to the extent he was treated differently, was treated differently for impermissible reasons.  Because Plaintiff has not come forward with any evidence that would permit a reasonable finder of fact to conclude, rather than to speculate, as Plaintiff does, that Defendant discriminated against Plaintiff because of his race, national origin, color, or age, the Court recommends that Defendant's Motion for Summary Judgment be granted with respect to Plaintiff's discrimination

---

[17] Plaintiff did testify that on one occasion, Goldfinger may have called him either "ching" "chink" or "chicken." (See Plaintiff's Dep., at 400.)  However, Plaintiff was unsure about what was actually said. (See id. at 248, 1017.)

claims.

IV.  <u>Retaliation Claims</u>

   A.  <u>Legal Standard</u>

   Title VII and the ADEA prohibit an employer from retaliating against an employee who engages in protected activity, specifically, activity in opposition to an unlawful employment practice. See 42 U.S.C. § 2000e-3(a); <u>see also</u> <u>Fitzgerald v. Henderson</u>, 251 F.3d 345, 358 (2d Cir. 2001). As with the burden shifting analysis applied to discrimination claims, an employee must first demonstrate a <u>prima</u> <u>facie</u> case of retaliation, after which a presumption of retaliation arises; the employer must then articulate a legitimate, non-retaliatory reason for the adverse employment action, and the employee then must show that unlawful retaliation played a part in the adverse employment action. <u>See</u> <u>Jute</u>, 420 F.3d at 173; <u>see also</u> <u>Quinn v. Green Tree Credit Corp.</u>, 159 F.3d 759, 768 (2d Cir. 1998); <u>Fields v. New York State Office of Mental Retardation & Developmental Disabilities</u>, 115 F.3d 116, 120-21 (2d Cir. 1997).

   In order to demonstrate a <u>prima</u> <u>facie</u> case of retaliation under Title VII or the ADEA, a plaintiff must produce evidence sufficient to permit a reasonable trier of fact to conclude that: 1) the employee engaged in a protected activity under Title VII or the ADEA, 2) that the employer was aware of this activity, 3) that the employer took adverse action against the employee, and 4) that

48

a causal connection exists between the protected activity and the adverse action, "i.e., that a retaliatory motive played a part in the adverse employment action." Kessler, 461 F.3d at 205-06 (quoting Cifra v. General Electric Co., 252 F.3d 205, 216 (2d Cir. 2001)). Although the burden that a plaintiff must meet at the prima facie stage is de minimis, the plaintiff must at least proffer competent evidence of circumstances that would be sufficient to permit a rational finder of fact to infer a retaliatory motive. See Jute, 420 F.3d at 173; Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987).

B. Application

Plaintiff alleges that the disciplinary actions taken against him occurred, in part, because of his prior EEOC activity. The filing of an EEOC complaint is protected activity and satisfies the first element of a prima facie case of unlawful retaliation. See Gregory v. Daly, 243 F.3d 687, 700-01 (2d Cir. 2001). Additionally, there were two supervisors who were both aware of Plaintiff's prior EEOC activity and also issued disciplinary actions against him: Gregorio/Prekopa and Pagano.[18] This is sufficient to meet the second requirement of employer knowledge of protected activity. See Patane v. Clark, 508 F.3d 106, 115 (2d

---

[18] The only evidence of Pagano's prior knowledge appears to be the finding by the ALJ in the Third EEOC Action indicating that Pagano "was the only management official to have some type of knowledge of the Complainant's earlier EEOC activity . . . ." (2005 EEOC Decision, at 4.)

Cir. 2007) (citing <u>Kessler</u>, 461 F.3d at 210, and <u>Gordon v. N.Y. City Bd. of Educ.</u>, 232 F.3d 111, 116 (2d Cir. 2000)); <u>see also</u> <u>Avillan v. Potter</u>, No. 04 Civ. 9019, WL 3103309, at *17 (Nov. 1, 2006) (finding that filing a complaint with the Postal Service's EEO Office was sufficient to satisfy the knowledge requirement).[19] Furthermore, Defendant concedes that adverse actions were taken against Plaintiff.    Thus, only the final element - a casual connection between the adverse actions and the protected activity - is at issue.

Defendant argues that there is no evidence of a causal connection between Plaintiff's EEOC complaints and the subsequent disciplinary actions.    Further, Defendant argues that, even if there were a connection, Defendant has offered unrefuted, non-retaliatory, reasons for the actions taken.    While Plaintiff asserts that the actions were retaliatory, he provides no explanation or evidence to support his assertion.    As explained below, the Court finds that Plaintiff has not offered sufficient evidence to permit a reasonable finder of fact to conclude that the disciplinary actions taken by his supervisors were motivated by retaliatory animus.

---

[19] Defendant suggests that because neither O'Neill nor Goldfinger were aware of Plaintiff's prior EEOC activity, Plaintiff has failed to establish the knowledge element of a <u>prima</u> <u>facie</u> case. (<u>See</u> Def. Mem., at 18 n.8.).    However, general corporate knowledge that a plaintiff has engaged in protected activity is sufficient to meet this requirement.    <u>See</u> <u>Patane</u>, 508 F.3d at 115.

### 1.    Prima Facie Case - Causation

"Proof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." Gordon v. New York City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000).

There are two relevant periods of time from which a claim of retaliation could arise. The first is the period from 2000 to 2001, involving the discipline issued by Gregorio/Prekopa. The second period of time is from 2003 to 2004, leading ultimately to Pagano's removal notice. With regard to the first period of time, Plaintiff has not offered any direct evidence that Gregorio/Prekopa was motivated by retaliatory animus. Moreover, Plaintiff admitted to not reporting an accident, which was the reason he was disciplined. Thus, there is no direct evidence of a causal connection between Plaintiff's prior EEOC complaint against Gregorio/Prekopa and the October 2001 NOS.

There is also no indirect evidence of retaliation. As an initial matter, the length of time between Plaintiff's first EEOC Complaint in December of 2000, made against Gregorio/Prekopa, and the next disciplinary action taken against Plaintiff by Gregorio/Prekopa - the October 2001 NOS - was ten months. This

period of time is insufficient, by itself, to establish a causal connection between Plaintiff's prior EEOC activity and the adverse employment action.  See <u>Clark County School Dist. v. Breeden</u> 532 U.S. 268, 273, 121 S. Ct. 1508, 1511 (2001) (per curium) (citing cases in which the temporal proximity - less than a three-month gap - was insufficient when offered as the only evidence of causality).

Furthermore, there is no evidence of disparate treatment. Although Gregorio/Prekopa did admit that he had never before issued discipline to another employee for failing to report an accident, (<u>see</u> Ex. 13 annexed to Pl.'s Opp., at 9.), there is no evidence, other than Plaintiff's unsupported assertion, that there were any other employees who witnessed an accident, failed to report it, and were not disciplined.   Thus, there are no similarly-situated employees who were treated differently.

Finally, the October 2001 NOS was eventually reduced to an "official discussion," which both parties agree is not considered to be a disciplinary action.  (<u>See</u> Pl.'s Dep., at 240.)  To be an adverse employment action in the retaliation context, the "employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." <u>Kessler</u>, 461 F.3d at 209.  A single notice, reduced to an official discussion, does not rise to the level of the kind of action that would dissuade a reasonable worker from making or supporting a charge of discrimination.  Therefore,

a single notice of suspension reduced to an official discussion, in this context, is not, an adverse employment action. See Blake v. Potter, No. 03 Civ. 7733 (LAP), 2007 WL 2815637, *9 (S.D.N.Y. Sept. 25, 2007) (finding that a single letter of warning would not dissuade a reasonable employee in plaintiff's position from complaining about discrimination); Hill v. Children's Village, 196 F. Supp. 2d 389, 397 (S.D.N.Y. 2002) (warning letter regarding plaintiff's conduct was insufficient to create a tangible employment detriment); Ezell v. Potter, 400 F.3d 1041, 1049 (7th Cir. 2005) ("a letter of warning is generally considered insufficient to qualify as an adverse employment action"); Moore v. Potter, 353 F. Supp. 2d 410, 415 (E.D.N.Y. 2005) (questioning whether a "Proposed Letter of Warning in Lieu of Time-Off Suspension" constitutes an adverse employment action); cf. Garvin, 367 F. Supp. 2d at 571 (holding that although a singular disciplinary action might not constitute an adverse employment action, forcing an employee to file multiple grievances in response to an "unusual" pattern of disciplinary actions might constitute an adverse employment action.) Thus, Plaintiff has failed to demonstrate a prima facie case of retaliation with regard to the 2000 - 2001 time frame.

With regard to the second relevant time frame, between April 2003 and January 2004, Plaintiff's supervisors took five disciplinary actions against Plaintiff, culminating in his removal

(which was later reversed).  Pagano, who was aware of Plaintiff's prior EEOC activity, was the supervisor who issued the January 2004 NOR for three errors in handling mail.  Thus, as before, the only question is whether there is evidence of a causal connection between Plaintiff's prior EEOC activity, and the January and February 2004 NORs.

The Second Arbitration Decision held that Plaintiff was subjected to disparate treatment.  (See Second Arbitration Decision, at 14.)  The arbitrator noted that no harm whatsoever came from Plaintiff's errors and that, since he handled more Express Mail than any other employee, and yet had "a much lower failure rate," being singled out for a few mistakes was not fair or equitable, and was discriminatory.[20]  (Id.)  This is indirect evidence of a causal connection between the protected activity and the adverse employment actions.  See Gordon, 232 F.3d at 117.

Because Plaintiff's burden at the first step is "minimal," see Woodman v. WWOR-TV, 411 F.3d 69, 76 (2d Cir. 2005); accord Jute, 420 F.3d at 173, the Court finds that, like the allegations of discrimination, the arbitrator's decisions are sufficient to establish a prima facie case of retaliation: Plaintiff engaged in

---

[20] However, the arbitrator did not focus on the past disciplinary actions, cited in the Notices, or the role they played in the decision to remove Plaintiff.  The First Arbitration Decision, addressing the May 2003 NOS did, however, reject the Post Office's contention that Plaintiff made "chronic" errors.  (See First Arbitration Decision, at 11.)

protected activity by filing EEOC claims; Defendant was aware of this activity; Defendant took an adverse employment action against Plaintiff; and, based on the arbitration decisions, which concluded there was disparate treatment, there is indirect evidence of a causal connection between the protected activity and the adverse action.

     2. <u>Defendant's Non-Retaliatory Reason is not Pretextual</u>

Defendant has asserted a non-retaliatory reason for issuing the January 2004 NOR - Plaintiff's history of scanning errors. Therefore, to sustain his claim, Plaintiff must still come forward with admissible evidence sufficient to permit a rational finder of fact to infer a retaliatory motive or animus. <u>Jute</u>, 420 F.3d at 173.

Here, Plaintiff's second EEOC Complaint was filed in June 2002. Beginning in April of 2003, nearly ten months after the second EEOC Complaint, Plaintiff's supervisors took five disciplinary actions against Plaintiff in five months – the April 2003 NOS (later reduced to a Letter of Warning, <u>see</u> Def.'s 56.1 ¶ 44), the May 2003 NOS (overturned in the fist arbitration, <u>see</u> First Arbitration), the July 2003 NOS, and the August 2003 NOS.[21] Five months after that, Pagano, who was personally aware of

_____

[21] Plaintiff asserts that the August 2003 NOS was dismissed by Long Beach after the Second Arbitration decision. (<u>See</u> Pl.'s Opp., at 21.) However, the Second Arbitration decision did not address that disciplinary action, and there is no evidence that this charge was subsequently reduced. (<u>See</u> Second Arbitration.)

Plaintiff's prior EEOC activity, issued the January 2004 NOR, which was later reversed in the Second Arbitration.

The question, therefore, is whether the disciplinary actions taken by Plaintiff's supervisors form a pattern of discipline from which a reasonable fact-finder could both conclude a causal connection between the prior EEOC complaints and the adverse employment actions, and ultimately conclude the actions were taken, at least in part, because of retaliatory animus.  They do not.

First, as was already discussed, the arbitration decisions do not attribute any motivation for the discriminatory treatment, and certainly are not evidence of retaliation for protected activity. Next, of the five disciplinary actions taken after Plaintiff filed the Second EEOC Complaint, only one was overturned completely, and two remained unchanged.  Notwithstanding Plaintiff's claim that the disciplinary actions were too severe or unfair, each had some legitimate basis in fact.  Furthermore, rather than being unusual, the disciplinary actions against Plaintiff appear to be consistent with discipline against other employees, which became more severe as a history of poor performance was documented, or if a particularly serious incident occurred.

Plaintiff has submitted evidence showing that if an employee had two prior Letters of Warning, then Pagano gave a seven-day suspension notice.  (See, e.g., Ex. 23 annexed to Pl.'s Opp. at GOV 12255-56, GOV 12022-23, GOV 12025-26.)  Plaintiff's Notice of

Removal cited five previous disciplinary actions: two letters of warning and three fourteen-day suspensions. (See Ex. H annexed to Schwartz Decl.)   Thus, a notice of removal issued after three fourteen-day suspensions does not suggest an unusual pattern of discipline.

In any event, Pagano issued a Notice of Removal against another employee without any prior disciplinary history.   That Notice of Removal cited "Creating a Hostile Work Environment/ Unacceptable conduct," relating to a physical altercation with another employee. (See id. at GOV 12632-33.)   This is similar to Plaintiff's September 2000 NOR, which Plaintiff was issued after he allegedly grabbed another employee.[22]

Finally, both the length of time between the second EEOC Complaint filed in 2002, and the January 2004 NOR - nearly two years - and the second EEOC complaint and the April 2003 NOS - nearly ten months - is too lengthy to raise an inference of a causal connection between Plaintiff's prior EEOC activity and Pagano's disciplinary action. See Breeden 532 U.S. at 273, 121 S. Ct. at 1511.

Viewing the evidence in the light most favorable to Plaintiff, there is not a sufficient basis for a reasonable trier of fact to conclude that the reasons offered by Defendant were false, or that

---

[22] The September 2000 Notice of Removal was issued by a different supervisor.

retaliation played a role in the adverse employment actions taken against Plaintiff.  <u>See</u> <u>Quinn</u>, 159 F.3d at 770.  The arbitration decisions, though pointing to evidence of unfair treatment, do not indicate that the discipline was <u>retaliatory</u>.  Furthermore, the pattern of disciplinary actions taken against Plaintiff, ten months after his second EEOC action, was not so unusual that one could infer retaliatory animus from the pattern itself.  Thus, Plaintiff has failed to meet his "ultimate burden" of coming forward with evidence that the January or February 2004 NORs were issued in retaliation for his prior EEOC activity.  <u>See</u> <u>Reeves</u>, 530 U.S. at 143, 120 S. Ct. at 2106 (quoting <u>Burdine</u>, 450 U.S. at 253); <u>but see</u> <u>Garvin</u>, 367 F. Supp. 2d at 559 (finding an eleven-month delay between the protected activity and the adverse employment action, together with an "unusual" pattern of at least eleven disciplinary actions, only one of which withstood the grievance process, was sufficient to raise issues of material fact with respect to causality and retaliatory animus).  Therefore, Plaintiff's retaliation claims should be dismissed with prejudice.

## CONCLUSION

For the reasons stated above, this Court recommends that the Title VII claims related to the June 2000 LOW and the September 2000 NOR, and the September 2002 LOW, should be dismissed for failure to exhaust administrative remedies. Plaintiff's remaining claims should be dismissed because there are no genuine issues of material fact that would allow a reasonable factfinder to conclude that Plaintiff was subject to unlawful discrimination or retaliation. Defendant's Motion for Summary Judgment should therefore be granted, and Plaintiff's Amended Complaint should be dismissed with prejudice.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten days from service of this Report to file written objections. See also Fed. R. Civ. P. 6(a) and (e). Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Lewis A. Kaplan, U.S.D.J., and to the chambers of the undersigned, Room 1660. Any requests for an extension of time for filing objections must be directed to Judge Kaplan. Failure to file objections will result in a waiver of those objections for purposes of appeal. See Mario v. P & C Food Mkts., Inc., 313 F.3d 758, 766 (2d Cir. 2002); Spence v. Superintendent, 219 F.3d 162, 174 (2d Cir. 2000); Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989) (per curiam).

Respectfully submitted,

_____

THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Dated: February 13, 2008
      New York, New York

Copies mailed to:

Ben song
99-30 59th Avenue, Apt. 2I
Rego Park, NY 11368

Matthew Lane Schwartz
Assistant United States Attorney
U.S. Attorney's Office, S.D.N.Y.
86 Chambers Street
New York, NY 10007